**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
ERIN DICKS,

<table>
<tr><td></td><td>Plaintiff,</td><td><u>**COMPLAINT**</u></td></tr>
<tr><td>-against-</td><td></td><td></td></tr>
<tr><td></td><td></td><td>**PLAINTIFF DEMANDS**<br>**A TRIAL BY JURY**</td></tr>
</table>

N.Y.C. HEALTH AND HOSPITALS CORP.,

and

TANDYM GROUP LLC f/k/a THE EXECU-SEARCH
GROUP,

                                          Defendant.

-----------------------------------------------------------X

Plaintiff ERIN DICKS, by and through her attorneys PHILLIPS & ASSOCIATES ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, N.Y.C. HEALTH AND HOSPITALS CORP. ("NYCHHC"), AND TANDYM GROUP LLC f/k/a THE EXECU-SEARCH GROUP ("EXECU-SEARCH"), upon information and belief as follows:

<u>**NATURE OF THE CASE**</u>

1.    Plaintiff brings this action alleging that the Defendants have violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*., as amended, ("ADA"), the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq*. ("NYCHRL"), and seeks damages to redress the injuries she has suffered as a result of being discriminated against on the basis of her disability and retaliated against in response to her complaints of discrimination.

1

2.  Defendant NYCHHC harassed Plaintiff, through mocking and sabotaging conduct, and then terminated Plaintiff because of her mobility disability, even though she could perform her job with and without a reasonable accommodation.  Although due to Defendant's discriminatory conduct Plaintiff needed an accommodation, Defendant failed to engage in an interactive process and terminated her.

3.  Defendant Execu-Search, which placed Plaintiff at NYCHHC, terminated her, refused to find her comparable employment thereafter, and took no action against NYCHHC to rectify the disability harassment and discrimination of which they were informed and aware.

## JURISDICTION AND VENUE

4.  Jurisdiction of this Court is proper under 42 U.S.C. §§ 12101 *et seq*., and 28 U.S.C. §§ 1331 and 1343.

5.  The Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to 28 U.S.C. § 1367.

6.  Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL PREREQUISITES

7.  Plaintiff filed an EEOC Charge of Discrimination against NYCHHC on April 1, 2022.

8.  Plaintiff received a Notice of Right to Sue Defendant N.Y.C. Health and Hospital Corp. from the EEOC on May 10, 2022, and this action is being commenced within 90 days of its issuance.

9.  Plaintiff filed an EEOC Charge of Discrimination against Execu-Search on May 13, 2022.

10.  Plaintiff received a Notice of Right to Sue Defendant Execu-Search (now known as Tandym Group LLC) from the EEOC on July 26, 2022, and this action is being commenced

within 90 days of its issuance.

11.     A copy of both Notices are annexed hereto as **Exhibit A and Exhibit B.**

12.     A Notice of Claim was mailed to the N.Y.C. Health and Hospital Corp. Office of Legal Affairs on November 11, 2021, less than 90 days after the last day of discrimination. Plaintiff received notice that the Notice of Claim was returned undelivered on February 7, 2022. Thereafter, the Notice of Claim was sent to the N.Y.C. Health and Hospital Corp. Office of Legal Affairs via email on February 7, 2022.

13.     Notice requirements of § 8-502 of the New York City Administrative Code have been met by the contemporaneous transmission of this Complaint, to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York. A copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as **Exhibit C**.

## PARTIES

Plaintiff

14.     Plaintiff Erin Dicks is a 56 year old woman living in the State of New Jersey.

15.     Plaintiff is a Nurse Practitioner ("NP") which is an Advanced Practice Registered Nurse. She has worked as an NP for 21 years.

16.     Plaintiff suffered a work injury in 2017, causing two herniated discs in her vertebrae. She had spinal fusion surgery in October of 2019 and went to physical therapy afterwards.

17.     As a result, Plaintiff has a disability which substantially limits the major life activity of walking.

18.     Plaintiff's disability mostly affects her gait and walking speed. Her disability also limits her use of stairs, the distance she can walk, and the length of time she can comfortably

stand.

19.   Plaintiff's mobility disability is outwardly apparent.

20.   Plaintiff sometimes uses a rollator for stability and increased mobility. The rollator reduces the amount of weight and stress to her back when ambulating, and allows her to sit when needed, thereby reducing pain.

21.   At all relevant times, Plaintiff could successfully perform the essential functions of her job with or without the use of a mobility aid.

Defendant N.Y.C. Health and Hospitals Corp.

22.   NYCHHC is a non-mayoral agency of the City of New York that provides health services throughout the City of New York through multiple divisions.

23.   One of the divisions of Defendant NYCHHC is Gotham Health, Belvis ("Belvis") which oversees outpatient facilities providing primary and preventative care services.

24.   Belvis is located at 545 E. 142nd Street, Bronx, New York.

25.   NYCHHC employs 500 or more employees.

Defendant Execu-Search

26.   Execu-Search is located at 675 Third Avenue, New York NY.

27.   Execu-Search is a staffing agency that places contract employees with employers, including in the medical field.

28.   Execu-Search employs 500 or more employees.

Joint Employers

29.   At all relevant times, Plaintiff was jointly employed by NYCHHC and Execu-Search.

30.   NYCHHC and Execu-Search were joint employers of Plaintiff in that they shared commonalities of hiring, firing, discipline, compensation, insurance, records, and

supervision as to Plaintiff.

31.  NYCHHC controlled Plaintiff's day-to-day work schedule, placement and duties and was in control of making major employment decisions, including hiring and firing, and affecting the terms, conditions, and privileges of employment.

32.  NYCHHC decided which office in the facility Plaintiff worked from and whether she would administer flu vaccines or Covid-19 vaccines, controlled decisions related to Plaintiff's reasonable accommodations, and had the authority to terminate Plaintiff.

33.  Execu-Search is the staffing agency that placed Plaintiff in her position at Belvis.

34.  Execu-Search paid Plaintiff. If Plaintiff had any issues related to payroll, Plaintiff would direct her concerns to Execu-Search.

35.  Execu-Search is responsible for ensuring Plaintiff works in an environment that is compliant with non-discrimination and anti-retaliation law.

36.  Execu-Search controls whether Plaintiff is placed into future contract job-posts.

## **MATERIAL FACTS**

37.  Plaintiff has used the staffing agency Execu-Search for employment since June of 2020 when Plaintiff was placed at an NYCHHC healthcare facility located in Brooklyn, New York.

38.  For more than a year, Plaintiff worked from the Brooklyn facility without incident, providing Covid-19 testing. That placement ended on July 31, 2021.

39.  On August 13, 2021, Execu-Search placed Plaintiff on a new contract at a different facility: Belvis.  She earned $135.00 per hour.

40.  Plaintiff's job was to administer Covid-19 vaccines and, when needed, perform Covid-19 testing for members of the community. Her duties expanded to include administering

influenza vaccinations on October 12, 2021.

41.     In addition to her 10 hour/day shifts 3 days a week at Belvis, Plaintiff picked up an additional shift per week substituting for NPs as needed at various NYCHHC vaccination locations throughout the 5 boroughs.

42.     At all relevant times, Plaintiff was successfully performing the duties of her job, with or without a reasonable accommodation.

43.     Plaintiff's disability was never an issue at any of the other NYCHHC facilities that she worked at since June 2020.

44.     Soon after starting her position at Belvis, Reginald Fernandez ("Fernandez"), Assistant Director of Nursing, met with Plaintiff.  Fernandez oversaw the vaccination site at Belvis, and had the power to hire, fire, and affect the terms, conditions, and privileges of Plaintiff's employment.

45.     Fernandez stated that he and Irma Ortega ("Ortega"), the Operational Lead, had noted that Plaintiff was breathing rapidly when she arrived in the morning.  He then inquired whether Plaintiff would be able to perform the job. Plaintiff told him that she was able to perform the job.

46.     Fernandez did not ask if Plaintiff needed an accommodation to perform the job.

47.     Plaintiff did not come away from this meeting with the impression that it was called out of concern for her.  Instead, Plaintiff felt that Fernandez and Ortega were irritated and bothered by her disability.

48.     Ortega, as the Operational Lead for the vaccination and testing site at Belvis, had the power to hire, fire, and affect the terms, conditions, and privileges of Plaintiff's employment.

49.     Kathya Rojas ("Rojas") was the acting site lead when Ortega was not present.  Rojas

generally oversaw the day-to-day work, coordinating with, and reporting up to Ortega, who was often not present at the site. Rojas also had the ability to influence the decision-makers regarding employment status and the terms, conditions, and privileges of Plaintiff's employment.

50. Immediately after starting her position at Belvis, Plaintiff was treated differently, singled-out, and harassed because of her disability by her superiors, Fernandez, Ortega, and Rojas.

### Physical Lay-out of Vaccine Site

51. Belvis is a medical facility serving the surrounding community.

52. The vaccination area is located just off the main entrance of the facility.

53. The lay-out of the vaccination area entails a central area where the patients wait to be seen, fill-out paperwork, and sit for 15-30 minutes post-vaccination.

54. The waiting area is surrounded by three rooms from which Nurse Practitioners ("NP") and Registered Nurses ("RN") administer vaccinations.

55. Each of the rooms has a different lay-out, different equipment and are different sizes.

56. Room #2 is medium-sized and has everything needed for administering vaccinations, including a printer to print the necessary vaccine paperwork and a refrigerator for vaccine storage.

57. Room #1 is called the "NP office." It is a much larger office. It also is set up for everything needed for vaccine administration including a printer and refrigerator.

58. Room #3 is the smallest of the three offices. It is also the only office that does not have a printer or a refrigerator.

59. A nurse using Room #3 for vaccination administration must enter another office to retrieve each influenza vaccine just prior to vaccination and then again after vaccination to retrieve

the printout of the patient's vaccination summary.

60. During the first several months that Plaintiff worked at the Belvis site, Ortega or Rojas would assign the NPs and nurses to any one of the three rooms, randomly and interchangeably. Room #3 was used the least, and only if necessary.

61. In the back of the Belvis site, there were two trailers specifically used for Covid-19 testing.

62. To reach the trailers from inside the building, it was a short walk through the back door.

63. However, the path to the trailer upon exiting includes a narrow, concrete set of stairs with no hand-railing. These steps are not ADA-compliant.

64. To reach the trailers otherwise requires exiting the building walking a substantial distance outside around the corner and then entering the testing area through the patient entrance.

Discriminatory Harassment and Conduct

65. Plaintiff worked professionally and competently administering Covid-19 vaccines after brief instruction at Belvis on August 13, 2021.

66. However, Rojas began unfairly scrutinizing Plaintiff's actions and instructing her, and only her, to be sure she was walking around, checking on people that may require assistance filling out forms.  Rojas always stated that although Ortega, who was rarely present at the site, was directing her to let Plaintiff know she was not walking around enough.

67. On Tuesday, October 5, 2021, Plaintiff arrived at work using a rollator to assist her mobility.  Use of the rollator at work was recommended by her heath care provider to relieve back stress and pain.

68. Very soon after arriving to work, Ortega, who was not present at the site, texted Plaintiff to call her, which Plaintiff did promptly.

69. **Ortega asked Plaintiff why she was using a rollator.**  Plaintiff informed her that it

assisted with her mobility disability.

70.     Ortega stated: **"You can't be working here using that thing."**

71.     Plaintiff asked why since the rollator was only used for walking and did not interfere with her ability to do her job vaccinating.

72.     Ortega stated that she was going to have to speak with Fernandez about it and they would all have a meeting.

<u>Sabotaging Plaintiff Because of Her Disability</u>

**SCHEDULE CHANGE**

73.     Within days of Plaintiff bringing her rollator to work, the harassment from her supervisors escalated to sabotage.

74.     Plaintiff had been scheduled to work October 11, 12 and 13, 2021. Monday, October 11 was Columbus Day, a holiday that was paid time and a half by NYCHHC.

75.     Plaintiff checked the posted schedule on the last shift she worked that previous week, to confirm that she would work those days the following week.

76.     Yet, apparently on Friday, October 8, 2021, unbeknownst to Plaintiff, she was inexplicably removed from the schedule for Monday October 11 and replaced with 2 RNs that were on temporary assignment at the Belvis facility.

77.     Plaintiff was not notified of this change in any form.

78.     It was happenstance that Plaintiff checked office email early that Monday morning, as she was logging in to see if a meeting with Fernandez had been scheduled prior to her usual starting time to discuss her use of the rollator.

79.     But for Plaintiff checking for the meeting, she would not have been aware that she was removed from the schedule. In addition to losing out on holiday pay, she also lost one day

of earnings for that week. Plaintiff also would have lost time commuting to the site in the Bronx from her home in NJ, only to be told she was no longer scheduled to work that day.

80.    Plaintiff asked Rojas how she could be taken off the schedule without anyone notifying her and Rojas responded that no one is allowed to communicate by text.  This was untrue as Plaintiff has received and sent texts related to work on multiple occasions.

**OFFICE ASSIGNMENT**

81.    During the same week, the nurses began administering influenza vaccines in addition to Covid-19 vaccines. Influenza vaccine serum differs from Covid-19 in that it had to be kept continually refrigerated.

82.    When Plaintiff arrived for her next shift, Tuesday, October 12, 2021, and less than a week after bringing her rollator to work, Rojas instructed Plaintiff that she must work from Room #3 – the smallest room that is not fully equipped.

83.    Plaintiff asked Rojas if she was explicitly assigned that room. Rojas replied in the affirmative, stating that Ortega had said she had to use that room.

84.    Mandatory assignment to this specific room had never occurred before in the 2 months that Plaintiff had been working at Belvis.

85.    Working from Room #3 required Plaintiff to stand-up and go to another office at least twice for each patient seeking an influenza vaccine.

86.    The two other temporary RNs were also working and were assigned to the other offices that were larger and properly equipped for vaccinations with a printer and a refrigerator.

87.    When Plaintiff prepared for her first patient requiring the Influenza vaccine, another nurse named Kathleen, placed a vial of it on Plaintiff's cart, apparently out of practicality since she had just been stocking the refrigerators with the influenza vaccine.

88.   Shortly after, Rojas approached Plaintiff stating that she must get up and get the vaccine from the other office herself.  Plaintiff was not permitted to ask anyone to help.

89.   Plaintiff stated that she did not ask anyone to bring it to her. Later, Plaintiff asked Kathleen why she told Rojas that she had.  Kathleen responded that she had not.

90.   Kathleen informed Plaintiff that Rojas had specifically approached her and asked her if Plaintiff had requested her to do that. Kathleen informed Plaintiff that she was unlocking the refrigerator and knew Plaintiff needed one.  So, Kathleen took it out while the refrigerator was unlocked and placed it on Plaintiff's tray.

91.   Rojas and Ortega purposely assigned Plaintiff to a room that would unnecessarily increase the difficulty of her job duties to further harass and sabotage her employment.

**HUMILIATING MANAGEMENT MEETING**

92.   That same day Plaintiff was assigned to specifically work from Room #3, Rojas informed her that she was to report to a meeting with Fernandez's office at 2:30 p.m.

93.   At the meeting, in addition to Plaintiff and Fernandez, Rojas was present, and Ortega joined by phone.

94.   The meeting began with an admonishment from Fernandez, telling Plaintiff she cannot keep her rollator in the hall, outside of her office.

95.   Plaintiff explained that the office she was specifically assigned to that day was too small to have it inside.

96.   Fernandez told Plaintiff that she needs to fold it up and place it in the back of the office.

97.   Plaintiff complained that she had been assigned inexplicably to the smallest office and the only one of the three without a printer or refrigerator.  Plaintiff stated that if she had been placed in one of the other rooms, she would be able to perform her job without the use of

the rollator because each was properly equipped for the additional responsibility of administering influenza vaccine.

98.  Ortega stated that this accommodation, being placed in the NP Office or Office #2, was not possible.  Plaintiff knew this to be untrue.

99.  Feeling very upset, humiliated and under attack, Plaintiff stated that she felt she was being discriminated against because of her disability.

100.  Plaintiff detailed the extra scrutiny she was receiving, being told she was not able to work there while using her rollator, the abrupt schedule changes, and other incidents of harassment.

101.  Rojas and Ortega vigorously denied that any harassing conduct had occurred, leaving Plaintiff feeling gaslighted.

102.  Fernandez indignantly stated that they would have expected Plaintiff to have informed them about the rollator before bringing it in.

103.  Plaintiff stated that she didn't believe it would be an issue, as she had been regularly working out of the larger rooms and was able to perform her job duties perfectly well.

104.  Fernandez again questioned whether Plaintiff could do her job.  **He stated that if she was going to continue working there, he did not want to be hearing (and then he made panting sounds, mocking Plaintiff's breathing), or see (at which point he mockingly rolled his chair around the room).**

105.  Rojas suggested that the best thing would be "to accommodate" Plaintiff by assigning her full-time to the testing trailer located outside in the back of the building.

106.  Having worked on one or two occasions doing testing from the trailer, Plaintiff was aware that the path of travel to the trailer was not easily accessible for her. On one of those

occasions, Plaintiff broke her cell phone as she struggled to safely get down the stairs without a handrail, maneuvering her bag and rollator down separately after she descended.

107. Plaintiff described this experience and made clear that the testing trailer would *not* be an accommodation.

108. The meeting ended with Fernandez stating to Plaintiff that he should be included in all future conversations related to her disability to avoid miscommunications or if the Plaintiff came to have need for an accommodation.

**RETALIATORY ASSIGNMENT TO THE TRAILER**

109. When Plaintiff arrived to work the following day, Wednesday, October 13, 2021, she was informed that she was assigned to the testing trailer.

110. This assignment was made despite Plaintiff's clear statements the day prior, to all three of her supervisors, that the trailer was very difficult for her to access due to her mobility disability.

111. Moreover, all the regular testers were present, and it was apparent Plaintiff had not been needed there.

112. Nevertheless, Plaintiff worked the shift in the trailer as assigned, risking her safety as she struggled down the stairs without a railing, and then tried to pull her rollator behind her.

113. The only other way for Plaintiff to access the testing trailers required her to travel a relative long distance. This was difficult for Plaintiff, especially as she had to do it many times a day: for her lunchbreak, to use the restroom, to retrieve supplies, and to bring samples to the lab.

114. Because of the difficulty getting from the building to the trailer on October 13, 2021, Plaintiff did not take lunch or use the restroom during her shift.

115.    When Plaintiff arrived for her next scheduled shift the following week, she was again assigned to the testing trailer.

116.    Plaintiff told Rojas that they should speak to Fernandez - as he had directed at the last meeting that he be looped in for anything related to accommodations - because the trailer was not accessible for her.

117.    Rojas replied that Plaintiff should just go out of the building and walk the distance around the corner to the patient entrance instead of using the employee access.

118.    Plaintiff repeated that this was difficult to do for the several times a day she needed to do it:   for restroom use, taking her lunch, retrieving supplies or to deliver samples. Additionally, the weather forecast predicted heavy rain that day.

119.    Rojas did speak to Fernandez and relayed his directive that she should "go about her day" and he would speak to her when he got a chance.

120.    Plaintiff asked Rojas to please call Fernandez back and ask that he speak with her now, because she did not want to be stuck in the trailer again, unable to use the restroom or take breaks.

121.    Plaintiff was told to sit outside of Rojas's office until Fernandez would speak with her when he got a chance. Plaintiff did as she was instructed by Rojas.

122.    Plaintiff sat there waiting all day, for approximately 8 hours, but he never called her in to discuss the situation.

123.    Fernandez did pass by Plaintiff several times as she sat there.  He said good morning to Plaintiff on one of those occasions, but otherwise he did not speak to Plaintiff.

**DEFENDANT EXECU-SEARCH'S DISCRIMINATORY AND RETALIATION**

124.    At approximately 5:00 p.m. that day, October 18, 2021, as Plaintiff waited outside Rojas

office waiting to speak to Fernandez, she received a text from Leslie Wade ("Wade"), her recruiter at Execu-Search, asking if she could speak.

125. Wade was one of the Recruiters for Defendant Execu-Search. Wade had the power to hire, fire, and affect the terms, conditions, and privileges of Plaintiff's employment or to affect the decision-makers at Execu-Search of the same.

126. Wade informed Plaintiff that she had received an email from NYCHHC stating that they were ending her contract. Wade said the reason conveyed was that they had offered Plaintiff accommodations, but they were not satisfactory to Plaintiff.

127. Plaintiff, devastated by the termination, let Wade know that NYCHHC's stated reason was the exact opposite of what had actually happened.

128. Plaintiff described the many incidents of harassment, the denial of her use of the rollator, and the harassing and humiliating management meeting. Plaintiff made clear to Wade that instead of being accommodated, her supervisors had purposely made her job more difficult.

129. Plaintiff also let Wade know that she had been waiting for the past 8 hours to speak to Fernandez because the so-called accommodation – the testing trailer – was not accessible.

130. Plaintiff now knew that instead of intending to speak with her, Fernandez was arranging to terminate her contract.

131. Plaintiff told Wade that accommodating her disability should not have been an issue. In Plaintiff's text to Wade at 4:26 p.m., she tells Wade, "Basically to accommodate me they just needed to have me keep doing vaccines inside instead of testing which requires me to [describes the circuitous and distance path of travel to the testing trailer]." Plaintiff went on to tell Wade via text, "And each week I have covered at a different site and no issue. And site leads have asked me to cover at their site again."

15

132.    Wade responded that she would follow up with her supervisor, Rahul Vyas ("Vyas"), who

is a Managing Director at Execu-Search, and would let Plaintiff know when he responded.

133.    Vyas had the power to hire, fire, and affect the terms, conditions, and privileges of

Plaintiff's employment or to affect the decision-makers at Defendant Execu-Search of the

same.

134.    On October 21, 2021, having heard nothing after three days, Plaintiff texted Wade, saying:

"Hi Leslie, Did Rahul respond to you? Do any other sites have days they need an NP? I

can't even cover anyone because I have no base site. I've passed up three shifts."

135.    Plaintiff was referring to the fact that while working at Belvis, she supplemented her

income by voluntarily picking up shifts for other contract nurses needing coverage. Once

terminated from Belvis, Plaintiff could not cover new shifts or even the shifts she had

previously committed to.

136.    Wade texted back to Plaintiff at 4:01 p.m. stating: "I'm sorry, not at this time."

137.    Plaintiff responded immediately, "Can you ask if I can cover shifts?"

138.    Wade never responded.

139.    On October 26, 2021, five days later, Plaintiff texted: "Were you able to find out about

covering shifts?"

140.    Again, Wade never responded.

141.    On November 2, 2021, Plaintiff complained via email to Vyas, copying Wade, describing

again, in detail, the discriminatory termination, the discrimination and harassment that had

occurred at Belvis prior, and her contemporaneous communications with Wade about the

discriminatory conduct that had transpired at NYCHHC.

142.    Plaintiff concludes her email to Vyas by stating: "Leslie said she would speak to you about

it. I followed up with her a few days later by text, asking her if she spoke to you and if there were any openings available. My question regarding informing you was not answered and she said there are no openings available. I also asked if I could continue covering at other sites. I reminded Leslie that day, that I had been covering at other sites weekly with no problems."

143. Plaintiff goes on to make a complaint of discrimination against Defendant Execu-Search: **"I feel that not only was I discriminated against because of my disability at the NYCHHC Belvis site, I am now being discriminated against by your agency because of my disability and in retaliation for complaints of discrimination about your client NYCHHC**."

144. Vyas responds soon thereafter stating: "Hey Erin – we completely understand your frustration and distaste in this matter. We will relay this message to Philip/HHC and see if there is anything we can do. Unfortunately, we do not have any testing openings but we can assist to help you find out work [sic] outside of HHC/Testing. Let us know and we'll keep you posted on HHC's response in regard to this matter."

145. At 2:46 p.m., Plaintiff responds: "Rahul, It is concerning to me that you had not [already] reported my complaint of discrimination that occurred with your client NYCHHC during my contract with Execu-Search immediately. Your response that you understand my frustration indicates to me that you don't consider disability discrimination a serious matter…"

146. Plaintiff goes on to state that she assumes there is still a great need for the hiring of NP's to administer boosters and coverage for children 5-11 years old newly eligible for vaccination.

147.    Approximately one hour after this email exchange, Plaintiff received a curious email from Defendant Execu-Search with the subject line: ACTION NEEDED – Execu Search Workers' Compensation Certificate of Insurance (COI) Audit. The email requested production of a COI for previous dates worked, or a response to confirm she did not have a COI.

148.    Plaintiff had never been asked for a COI before and was unaware of any requirement for one.

149.    On November 4, 2021, and for the first time since complaining of discrimination to Defendant Execu-Search on October 18, 2021, Complainant received an email from an Execu-Search human resources representative ("HR rep"), stating: "Hi Erin, It has been brought to my attention that you feel you were wrongfully terminated by our client. I want to thank you for bringing this to our attention and we take your claim seriously. We were not aware of your termination until the client had already terminated your employment."

150.    The HR rep then informs Plaintiff that she must complete a "Complaint Form where you can detail everything that happened at the client and why you feel you have been discriminated against." **The HR rep attaches the form indicates that only after they receive a completed claim form, can she "then start the official investigation."**

151.    The HR rep states that the "investigation may take time" and that Execu-Search "can't control the client's decision to terminate."

152.    Defendant Execu-Search's claim form requires an excessive amount of detailed information that Plaintiff had already communicated to Wade and Vyes.

153.    The claim form also states that Execu-Search has other options to file a complaint but warns that if one chooses a different option they "should read and be aware of [Execu-Search's]

**mandatory reporting procedures** (emphasis added), whether you choose to use this form or not."

154.   NYCHHC terminated Plaintiff's employment because of her disability and in retaliation for complaining of disability discrimination.

155.   Execu-Search failed to investigate the discrimination that Plaintiff complained of or reassign her to comparable employment.

156.   The egregious harassment and abrupt termination experienced by Plaintiff has caused her to suffer humiliation, embarrassment, anxiety and other emotional distress and physical distress symptoms.

### DEFENDANTS' DISCRIMINATORY CONDUCT UNDER THE LAW

157.   Defendants knew that Plaintiff had a mobility disability.

158.   Defendants knew that Plaintiff could perform the essential functions of her job, with or without a reasonable accommodation.

159.   Defendant NYCHHC harassed Plaintiff for her disability.

160.   Defendant NYCHHC denied Plaintiff the use of her own mobility-aid required for her disability.

161.   Because of her disability, Defendant NYCHHC sabotaged Plaintiff's ability to do her work and purposely created impediments to her ability to work.

162.   Defendant NYCHHC knowingly and willfully refused to allow Plaintiff a reasonable accommodation such as the use of her mobility device, assignment to the NP room or room #2 for vaccinations, and to not be placed in an inaccessible facility.

163.   Defendants NYCHHC and Execu-Search terminated Plaintiff, an adverse employment action, because of her disability, request for accommodation, and complaints of

discrimination which are protected activity.

164.   Defendant Execu-Search failed to acknowledge or investigate Plaintiff's complaint of discrimination against itself.

165.   Defendant Execu-Search discourages complaints of discrimination and has specific and onerous practices and procedures that an employee must meet before they will take action regarding a discrimination complaint to which they have knowledge.

166.   Despite Defendant Execu-Search's knowledge that Plaintiff was being discriminated against, they nevertheless terminated Plaintiff's employment from NYCHHC.

167.   Defendant Execu-Search further discriminated and retaliated against Plaintiff by refusing to place Plaintiff at a new placement.

168.   Defendant Execu-Search failed to investigate the discriminatory conduct and termination NYCHHC had subjected Plaintiff to, despite being made immediately aware of Plaintiff's allegations of discrimination and retaliation.

169.   Defendants NYCCHC and Execu-search engaged in actions and conduct that were intentional and aimed at harming Plaintiff.

170.   As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation, which such employment entails.

171.   Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

172.   Plaintiff has experienced severe emotional distress.

173.   As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

174. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

175. As such, Plaintiff demands punitive damages against Defendants.

## AS A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER THE ADA

176. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

177. Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

178. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

179. Defendants engaged in unlawful discriminatory practices by discriminating against Plaintiff and terminating her because of her disability.

## AS A SECOND CAUSE OF ACTION
### RETALIATION UNDER THE ADA

180. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

**181.** 42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he
> has opposed any practice made an unlawful employment practice by

this subchapter, …

182.    The above section forbids retaliation for engaging in protected activity.

183.    Defendants engaged in unlawful discriminatory practices by terminating Plaintiff because she requested a reasonable accommodation for her disability and complained of discrimination, protected activities, under the law.

**AS A THIRD CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYSHRL**

184.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

185.    The New York State Executive Law § 296(1)(a) provides that,

> It shall be an unlawful discriminatory practice: For an employer … because of an individual's … disability… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

186.    Defendants engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by creating and maintaining discriminatory working conditions and otherwise discriminating against Plaintiff because of her disability.

**AS A FOURTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYSHRL**

187.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

188.    The New York State Executive Law § 296(1) (e) and (h) forbid retaliation for engaging in protected activity.

189.    Defendants engaged unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(e) and (h) by terminating Plaintiff because she requested a

reasonable accommodation for her disability and complained of discrimination, protected activities under the law.

## AS A FIFTH CAUSE OF ACTION
### DISCRIMINATION UNDER THE NYCHRL

190.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

191.    The Administrative Code of City of NY § 8-107 [1] provides that,

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived…disability…to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

192.    Defendants engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by creating and maintaining discriminatory working conditions and otherwise discriminating against Plaintiff because of her disability.

## AS A SIXTH CAUSE OF ACTION
### RETALIATION UNDER THE NYCHRL

193.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

194.    The Administrative Code of City of NY § 8-107 (6) forbids retaliation for engaging in protected activity.

195.    Defendants engaged in unlawful discriminatory practices by terminating Plaintiff because she requested a reasonable accommodation for her disability, and complained of discrimination, protected activities under the law.

### JURY DEMAND

196.    Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA, the NYSHRL, and the NYCHRL, by discriminating against Plaintiff because of her disability and retaliated against her for engaging in protected activity.

B.      Awarding damages to the Plaintiff, retroactive to the date of her discharge for all lost wages and benefits resulting from Defendants' unlawful termination of her employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, interests, and expenses incurred in the prosecution of the action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
        August 1, 2022

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**

                                By:     _Michelle A. Caiola_ __
                                        Michelle A. Caiola, Esq.

24

Jonathan Goldhirsch
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901-2107
mcaiola@tpglaws.com
jgoldhirsch@tpglaws.com